DARIN W. SNYDER (S.B. #136003) dsnyder@omm.com
THOMAS P. BROWN (S.B. #182916) tbrown@omm.com
RYAN J. PADDEN (S.B. #204515) rpadden@omm.com
STEVEN E. CONIGLIARO (S.B. #232102) sconigliaro@omm.com
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street, 26th Floor
San Francisco, CA 94111-3305
Telephone:    (415) 984-8700
Facsimile:    (415) 984-8701

FILED

ZEC8 JUN 11 P 3: 31

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

Attorneys for Plaintiff
Analogix Semiconductor, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

Analogix Semiconductor, Inc., a
Delaware corporation,

        Plaintiff,

    v.

Silicon Image, Inc., a Delaware
corporation; HDMI Licensing, LLC, a
Delaware corporation; and Simplay
Labs, LLC, a Delaware corporation;

        Defendants.

Case No. C08 02917 PVT

**ANALOGIX SEMICONDUCTOR,
INC.'S COMPLAINT AGAINST
SILICON IMAGE, INC., HDMI
LICENSING, LLC, AND SIMPLAY
LABS, LLC FOR: (1) VIOLATIONS
OF SECTION 1 OF THE SHERMAN
ANTITRUST ACT, (2) VIOLATIONS
OF SECTION 2 OF THE SHERMAN
ANTITRUST ACT, (3) VIOLATIONS
OF THE CALIFORNIA
CARTWRIGHT ACT, AND (4) UNFAIR
COMPETITION**

**DEMAND FOR JURY TRIAL**

1    Plaintiff Analogix Semiconductor, Inc. ("Plaintiff" or "Analogix") hereby

2    complains and alleges against defendants Silicon Image, Inc. ("Silicon Image"), HDMI

3    Licensing, LLC, and Simplay Labs, LLC (collectively, "Defendants") as follows:

## PARTIES

5    1.    Plaintiff Analogix Semiconductor, Inc. is a corporation organized and

6    existing under the laws of the State of Delaware, with its principal place of business in

7    Santa Clara, California.

8    2.    On information and belief, defendant Silicon Image, Inc. is a corporation

9    organized and existing under the laws of the State of Delaware, with its principal place of

10    business in Sunnyvale, California.

11    3.    On information and belief, HDMI Licensing, LLC is a limited liability

12    company organized and existing under the laws of the State of Delaware, with its

13    principal place of business in Sunnyvale, California.

14    4.    On information and belief, Simplay Labs, LLC is a limited liability

15    company organized and existing under the laws of the State of Delaware, with its

16    principal place of business in Sunnyvale, California.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

18    5.    This Court has subject-matter jurisdiction over this action under Section 4 of

19    the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1367.

20    6.    Silicon Image transacts business in this judicial district, including the sale

21    and offering for sale of its products, and Silicon Image has sufficient contacts with this

22    judicial district to subject itself to the jurisdiction of this Court.  Personal jurisdiction and

23    venue are therefore proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c).

24    7.    HDMI Licensing transacts business in this judicial district, including

25    administering the licensing of the High-Definition Multimedia Interface ("HDMI")

26    specification for the transmission of digital data (the "HDMI Standard," which, unless

27    otherwise indicated, refers to all versions of the HDMI specification).  HDMI Licensing

28

- 1 -

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1   also promotes the HDMI Standard from this judicial district. Personal jurisdiction and

2   venue are therefore proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c).

3       8.      Simplay Labs transacts business in this judicial district, including promoting

4   and providing testing technologies, programs, and interoperability performance standards

5   related to digital data. Personal jurisdiction and venue are therefore proper in this Court

6   pursuant to 28 U.S.C. §§ 1391(b) and (c).

7       9.      Pursuant to Northern District of California Civil Local Rule 3-5(b) and 3-

8   2(c), assignment of this Action to the San Jose Division is proper because, as described

9   above and below, a substantial part of the events which give rise to the claims occurred

10  there.

11              **BACKGROUND OF SILICON IMAGE AND HDMI LICENSING**

12      10.     Founded in 1995, Silicon Image designs, makes, and sells semiconductor

13  solutions, including transmitter and receiver solutions that enable digital data

14  transmissions.

15      11.     As early as 2001, Silicon Image had its first meeting with Hitachi, Ltd.

16  ("Hitachi"), Matsushita Electric Industrial Co., Ltd. ("Panasonic"), Phillips Consumer

17  Electronics International B.V. ("Philips"), Thomson Multimedia, Inc. ("Thomson"),

18  Toshiba Corporation ("Toshiba"), and others (collectively with Silicon Image, the

19  "Founders"), to establish a "working group" to create the HDMI Standard.

20      12.     In a November 4, 2002 press release, Silicon Image and the other Founders

21  announced that the "Founders have joined together to define" the HDMI Standard and to

22  found HDMI Licensing. As described on HDMI Licensing's website, "HDMI Licensing,

23  LLC is the agent responsible for licensing the HDMI specification, promoting the HDMI

24  standard and providing education on the benefits of HDMI to retailers and consumers."

25  HDMI Licensing was and is responsible for licensing the Founders' patents that are,

26  according to the Founders, "necessary" to comply with the HDMI Standard.

27      13.     In the same November 4, 2002 press release, the Founders also announced

28  the HDMI Specification Adopter Agreement ("Adopter Agreement"), which the Founders

- 2 -                           COMPLAINT OF ANALOGIX
                                SEMICONDUCTOR, INC.

1   require a company to sign before that company, called an "Adopter," can make, use, or

2   sell products that claim compliance with the HDMI Standard.

3       14.    Silicon Image is, and always was, closely related to HDMI Licensing:

4           a.    Before the creation of HDMI Licensing, Silicon Image performed the

5   roles now performed by HDMI Licensing, including administering the licensing of the

6   HDMI Standard and promoting the HDMI Standard.

7           b.    HDMI Licensing is, and always was, a wholly owned subsidiary of

8   Silicon Image.

9           c.    Silicon Image and HDMI Licensing share the same address at 1060

10  East Arques Avenue, Sunnyvale, CA 94085.

11          d.    Silicon Image and HDMI Licensing share the same media contact

12  and frequently issue identical press releases.

13          e.    On information and belief, employees from HDMI Licensing and

14  employees from Silicon Image share confidential information. Brett Gaines, who is now a

15  Vice President of Strategic Business Development for Silicon Image, was the first

16  President of HDMI Licensing. Mr. Gaines helped form the HDMI working group that

17  created the HDMI Standard.

18      15.    In December 2002, the Founders announced the HDMI Standard Version

19  1.0, indicating that they had finalized the first version of the HDMI Standard. The

20  Founders have announced several subsequent versions:

21      • HDMI Version 1.1 was released in May 2004;

22      • HDMI Version 1.2 was released in August of 2005; and

23      • HDMI Version 1.3 was released in June of 2006.

24              **HDMI SOLUTIONS AND HDMI-ENABLED PRODUCTS**

25      16.    Both Silicon Image and HDMI Licensing refer to the HDMI Standard as the

26  "de facto standard" for transmitting digital and audio data between consumer-electronics

27  products, which include digital TVs, DVD players, set-top boxes, A/V receivers,

28

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1   entertainment consoles, camcorders, and digital cameras. The HDMI Standard is also

2   increasingly common in other products, such as personal computers.

3       17.    The HDMI Standard is a set of protocols and electrical performance

4   specifications for transmitting digital data between a transmitter of digital data, such as a

5   set-top box or a DVD player, and a receiver of digital data, such as a digital TV. The

6   interface for this digital data transmission is a cable that connects the digital transmitter to

7   the digital receiver. In order for this transmission to occur, there must be both an HDMI

8   transmitter semiconductor solution and an HDMI receiver semiconductor solution. The

9   term "HDMI solutions" includes, among others, transmitter, receiver, and switch

10  solutions. The term "HDMI-enabled products" means products that incorporate an HDMI

11  solution.

12      18.    Participants in the market for HDMI solutions include both Founders and

13  Adopters. Founders are the companies, including Silicon Image, that created and

14  periodically revise the HDMI Standard. From the date that the HDMI Standard was

15  announced until today, the same companies have been the Founders.

16      19.    Adopters are companies, including Analogix, that have signed the Adopter

17  Agreement. The number of Adopters has grown from zero in 2002 to, as of April 8, 2008,

18  more than 800 separate companies. A complete list of Adopters is available at

19  http://www.hdmi.org/learningcenter/adopters_founders.aspx.

20      20.    The market for HDMI solutions divides into three categories:

21          a.    There are companies, such as Silicon Image and Analogix, that do

22  not make HDMI-enabled products, but instead design and sell HDMI solutions to other

23  companies that incorporate those solutions into HDMI-enabled products. Companies that

24  design and sell HDMI solutions can be categorized as (i) those that design and sell

25  discrete HDMI solutions, which are solutions that have HDMI-related functionality and/or

26  (ii) those that design and sell integrated solutions that incorporate HDMI-related

27  functionality along with non-HDMI-related functionality, such as video processing,

28  picture-in-picture, digital video recording, and other functionalities. There is a broader

- 4 -

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1   market for integrated HDMI solutions than for discrete HDMI solutions, and integrated

2   solutions, because they incorporate additional functionality, are generally priced higher

3   than discrete HDMI solutions.

4            b.       There are other companies, including at least two Founders, that both

5   have made HDMI solutions and make and sell products that incorporate those solutions.

6            c.       There are also companies that do not design or sell HDMI solutions,

7   but that buy HDMI solutions from Silicon Image or one of its competitors, and

8   incorporate those solutions into HDMI-enabled products. For example, and on

9   information and belief, most, and possibly all, of the Founders have purchased HDMI

10  solutions from Silicon Image.

11           21.    Silicon Image has held, on information and belief, more than 90% of the

12  market for discrete HDMI solutions that are sold to other companies. In its August 2,

13  2007 conference call with investors, Silicon Image described itself as holding "a very

14  commanding [market] share." The remaining market for discrete HDMI solutions is held

15  by a handful of companies, none of whom, on information and belief, possess a significant

16  market share. These companies include, among others, Analogix, Integrated Device

17  Technology, Inc., and STMicroelectronics, Inc.

18           a.       In-Stat, a market-research company that both Silicon Image and

19  HDMI Licensing cite as authoritative, reported in 2007 that Silicon Image has been the

20  market leader in the market for discrete HDMI solutions since the inception of that

21  market: "In December 2002, HDMI 1.0 was released. In January 2003, Silicon Image

22  began sampling the first HDMI silicon. Silicon Image has since maintained leadership in

23  discrete HDMI silicon production."

24           b.       Although there is some competition from integrated solutions, Silicon

25  Image has repeatedly stressed that its discrete solutions are in a unique market for several

26  reasons. One reason was explained by Silicon Image's CEO in a conference call with

27  investors on August 2, 2007. Because of Silicon Image's time-to-market, structural

28  advantage, which is described in detail in the next two sections, Silicon Image's discrete

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1  solutions are, at least for some time, the only HDMI solutions available: "It is still very

2  common for us to have our chip fronting an integrated part with HDMI in it and that's

3  largely because this year, if you wanted to do 1.3, you just couldn't get it out of any of the

4  integrated guys." This advantage is important because, as further explained by Silicon

5  Image's CEO, HDMI-enabled products have a short product life, and thus first-to-market

6  is critical for many companies "in the top-tier segment where you're looking for best in

7  class, latest features."

8          c.      Another reason that discrete HDMI solutions are unique is that, as

9  explained by Silicon Image's CEO in a conference call with investors on February 7,

10  2008, certain customers only want discrete HDMI solutions: "We have several customers

11  who have decided not to use [integrated, system-on-a-chip solutions] for reasons of

12  features, performance, or some cases even some of the power management features we've

13  integrated." Also during that call, Silicon Image's CEO recognized discrete solutions as a

14  unique market in which they compete, stating that Silicon Image is "still considered kind

15  of the gold standard with respect to certainly anything discrete."

16          22.     The number of HDMI-enabled products has grown substantially. According

17  to In-Stat, in 2002 there were zero HDMI-enabled products shipped; in 2007, there were

18  140 million HDMI-enabled products shipped; and in 2011, it is estimated that there will

19  be almost half a billion HDMI-enabled products shipped.

20          23.     Silicon Image and HDMI Licensing advertise that the HDMI Standard is the

21  de facto standard for transmitting digital data in the consumer-electronics market. As

22  described in a statement by HDMI Licensing's President in a January 5, 2008 press

23  release, "HDMI is no longer an option but has become a 'must have' element of every

24  home theater."

25          24.     Since HDMI Licensing requires a company to sign the Adopter Agreement

26  before making or selling HDMI solutions or HDMI-enabled products, the HDMI

27  Standard's status as a de facto standard means that if a company does not sign the Adopter

28  Agreement, it is effectively excluded from the market.

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

25.    For at least the following reasons, the HDMI Standard is likely to continue its status as the de facto standard for the foreseeable future:

a.    As described further below, it takes substantial time and resources for a company to comply with the HDMI Standard, as well as to make complementary assets to design, manufacture, and sell new HDMI solutions or HDMI-enabled products. Once a company has taken steps to comply with the HDMI Standard, these sunk costs discourage a company from pursuing alternatives.

b.    As the number of HDMI-enabled products continues to grow, network effects (i.e., the benefit of having interoperable HDMI-enabled products increases as the number of HDMI-enabled products increases) give the HDMI Standard an advantage over alternatives.

c.    Because there are only a few Founders and more than 800 Adopters, there are collective-action and transaction-costs problems that must be overcome before the Founders will accept, and the Adopters will adopt, alternatives.

d.    The need for compatibility with the existing and growing base of HDMI-enabled products discourages alternatives.

e.    The market for HDMI solutions has a high resell rate, meaning that if a company purchases one HDMI solution from Silicon Image, it will likely buy the next generation of solutions from Silicon Image as well.

f.    The HDMI Standard is required and/or authorized by government regulation. For example, in 2003, the Federal Communications Commission required all high-definition set-top boxes acquired by cable operators to include either an HDMI or an alternative, less-popular standard called Digital Visual Interface ("DVI"), which In-Stat referred to in 2007 as "a dying specification."

## SILICON IMAGE AND THE OTHER FOUNDERS CONTROL THE MARKET FOR HDMI SOLUTIONS

26.    Silicon Image and the other Founders have entered into an agreement to control the market for HDMI solutions.

COMPLAINT OF ANALOGIX SEMICONDUCTOR, INC.

27.    The content and form of the Founders' agreement is kept shrouded from the Adopters and the public. Silicon Image refers to a "Founder's Agreement" and "[F]ounders meetings" in its financial statements, but, on information and belief, the "Founder's Agreement" is not publicly available and the "[F]ounders meetings" are not public.

28.    On information and belief, the complete agreement between Silicon Image and the other Founders restrains competition by, among other things, controlling the HDMI Standard and the testing processes and licensing protocols related to the HDMI Standard. The following are some of the ways in which Silicon Image, together with the other Founders and through HDMI Licensing, exercises this control:

a.    The Founders created the HDMI Standard, and at their sole discretion, can and have revised the HDMI Standard and released new versions with which all Adopters must then comply in order to compete. The Founders also make changes to the HDMI Standard between official versions, with which all Adopters must then comply.

b.    The Founders created, and retain the exclusive authority to dissolve at their sole discretion, HDMI Licensing.

c.    The Founders created the Adopter Agreement, which defines what an Adopter must do before it can make, use, or sell HDMI solutions or HDMI-enabled products.

d.    The Founders created the HDMI Compliance Test Specification, and at their sole discretion, can and have revised the HDMI Compliance Test Specification and released new versions with which all Adopters must then comply in order for their products to be HDMI certified. The HDMI Compliance Test Specification sets the minimum requirements with which an Adopter must comply before submitting HDMI solutions or HDMI-enabled products for testing.

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

e.      The Founders created the HDMI Specification Test Equipment Maker Agreement, which a company must sign in order to make and sell test equipment that Adopters can use to test their products for compliance with the HDMI Standard.

f.      The Founders authorized, and certain of them operate, the Authorized Testing Center ("ATC"); they also created the Authorized Test Center Agreement ("ATC Agreement"). The Founders require an Adopter to submit its products to an ATC and pass that ATC's test before that Adopter can claim conformance to the HMDI Standard or use the HMDI logo. Silicon Image operates four of the seven ATCs, including the first, and still largest, ATC (and the only ATC located in North America) at its Sunnyvale address. Silicon Image also operates an ATC in Germany and two in China. Other Founders operate ATCs in France and Japan. A complete list of the seven ATCs, their addresses, and their operating companies is at http://www.hdmi.org/manufacturer/authorized_test_centers.aspx.

g.      The Founders require each Adopter to submit to HDMI Licensing books and records, including information about price and output levels, that are sufficient to ascertain the royalties the Adopter must pay.

h.      The Founders gave HDMI Licensing the "sole discretion" to terminate or modify its permission to an Adopter to use the HDMI logo.

29.     On information and belief, the Founders, together with and through HDMI Licensing, conduct the above market-controlling activities in secret. There are no public deliberations between the Founders; nor are there any public minutes of any of the Founders' meetings. Adopters like Analogix are not entitled to vote or otherwise participate in the content of the HDMI Standard or its testing. Instead, Adopters like Analogix must follow the mandates of the Founders and HDMI Licensing.

30.     In addition to the activities detailed above, HDMI Licensing charges exorbitant fees, including: (1) a $10,000 annual fee which is due upon execution of the Adopters Agreement and upon each anniversary thereafter; and (2) at least $7,500 in testing fees for each product submitted for testing at an ATC. There is an alternative

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1  annual fee for small-value manufacturers, as well as an alternative fee structure. On

2  information and belief, very few companies use this alternative structure.

3      31.    HDMI Licensing also charges royalties for each stand-alone HDMI solution

4  or HDMI-enabled product that an Adopter sells:

5          • For each end-user product, $0.15 per unit sold;

6          • If the Adopter reasonably uses the HDMI logo on the product and

7            promotional materials, then $0.05 per unit sold (as opposed to $0.15 per

8            unit sold if the HDMI logo is not used);

9          • If the Adopter implements High-bandwidth Digital Content Protection as

10           set forth in the HDMI Specification, then $0.04 per unit.

11     32.    Until 2007, Silicon Image received 100% of HDMI adopter royalty

12  revenues. But as detailed in Silicon Image's 2007 10-K, "during 2007, at a founders'

13  meeting, the founders decided to share the HDMI adopter's royalty revenues among the

14  various founders." In particular, the "HDMI founders reallocated the royalties to reflect

15  each founder's relative contribution of intellectual property to the HDMI specification."

16  **THE FOUNDERS USE THEIR MARKET CONTROL TO BENEFIT**
    **THEMSELVES, RESTRAIN COMPETITION, AND HARM CONSUMERS**

17

18     33.    Silicon Image entered into an agreement with the other Founders to

19  manipulate the process for developing and releasing the HDMI Standard and the HDMI

20  Test Specification with the intent to unreasonably restrain competition. The manipulation

21  of the development and release of the HDMI Standard and the HDMI Test Specification is

22  effected, in part, through HDMI Licensing.

23     34.    As described above, the Founders jointly and secretly revise the HDMI

24  Standard and the HDMI Compliance Test Specification and then release those new

25  versions. As described by Silicon Image's CEO in a August 2, 2007 conference call with

26  investors, the Founders decide what the new standard will be and when it will be released.

27     35.    Because the Founders, including Silicon Image, control the content and

28  timing of each version of the HDMI Standard and the HDMI Compliance Test

- 10 -

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1 Specification, Silicon Image and the other Founders obtain exclusive, pre-release

2 information. Silicon Image and the other Founders have an economic incentive to use,

3 and do use, this pre-release information to gain an advantage over the Adopters, which

4 have no advance knowledge of how to comply with the new version of the HDMI

5 Standard or how to test their products pursuant to the new version of the HDMI

6 Compliance Test Specification.

7      36.    This advance knowledge, which Silicon Image calls a "structural

8 advantage," means than Silicon Image and the other Founders have at least a 6- to 12-

9 month lead before other companies can design competing HDMI solutions and HDMI-

10 enabled products. As described by Silicon Image's CEO in an October 26, 2006

11 conference call with investors, *Silicon Image has a "structural advantage . . . because*

12 *we are helping the founding members figure out where to go with the development of*

13 *the standard. It gives us about, roughly, a six- to 12-month lead in the market."* And in

14 its 10-K for 2007, Silicon Image stated that "[o]ur leadership in the market for HDMI-

15 enabled products has been based on our ability to introduce first-to-market semiconductor

16 and IP solutions to manufacturers."

17      37.    Silicon Image and the other Founders also benefit from the structural

18 advantage they have as a result of their control of the HDMI Compliance Test

19 Specification. Because the Founders develop the HDMI Compliance Test Specification,

20 they have pre-release knowledge of its contents. This is important because HDMI

21 Licensing often releases the HDMI Compliance Test Specification several months after

22 the HDMI Standard is decided, thus increasing the Founders' time advantage.

23      38.    Silicon Image's structural, time advantage has meant that, as touted by

24 Silicon Image's corporate filings, Silicon Image "introduced the industry's first products

25 for *each* new version of the HDMI standard, providing a time-to-market advantage to our

26 customers." For example:

27           a.    HDMI Version 1.0 was released in December 2002, and in January

28 2003, Silicon Image announced the first available HDMI Version 1.0 solutions with its

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1    SiI9190 transmitter solution and SiI9993 receiver solution. On information and belief,

2    this was many months before the first competitor solution was announced.

3          b.    HDMI Version 1.2 was released in August 2005, and one day later,

4    Silicon Image announced the first available HDMI Version 1.2 solutions with its reference

5    ADD2 card, based on its PanelLink SiI1390. On information and belief, this was many

6    months before the first competitor solution was announced.

7          c.    HDMI Version 1.3 was announced in June 2006, and in August 2006,

8    Silicon Image announced the first available HDMI Version 1.3 solutions with its SiI9134

9    transmitter solution and SiI9133 receiver solution. On information and belief, this was

10   many months before the first competitor solution was announced.

11         39.    Silicon Image and the other Founders have also benefited from the 6- to 12-

12   month structural advantage by, among other ways, being able to release the first versions

13   of various HDMI-enabled products in numerous product classes. Such first-in-class

14   products can demand premium prices. Below are several examples of the Founders' first-

15   in-class HDMI-enabled products:

16         a.    One of the Founders was the first to release digital camcorders with

17   HDMI technology. According to the In-Stat 2007 report, this Founder released three of

18   the first HDMI camcorders in 2003, followed by four others in 2004.

19         b.    On April 10, 2006, another Founder announced the release of the

20   world's first HD DVD Notebook PC, incorporating Silicon Image's SiI 1930 HDMI

21   transmitter.

22         c.    In June 2006, one of the Founders was the first company to announce

23   the release of an HDMI capable desktop PC.

24         d.    This same Founder also released the first HDMI 1.3 video

25   entertainment device, only three months after Silicon Image's first HDMI 1.3 solution

26   became available. In the June 22, 2006 press release announcing the new HDMI 1.3

27   standard, the Founder announced that its video entertainment device would have HDMI

28

- 12 -

1.3 capabilities despite the fact that no HDMI 1.3 solution was publicly available at that

time.

        e.     On September 5, 2006, another Founder announced the first HDMI

1.3 DVD player for the European market, and on September 14, 2006, announced the first

HDMI 1.3 HD DVD player for the US market.

        f.     As announced on February 27, 2007, one of the Founders was the

first company to introduce a HDMI-capable LCD TV with Internet audio-visual

functionality.

    40.    The Founders have at least a 6- to 12-month advantage because Adopters

must engage in the time-consuming process the Founders require before an Adopter can

make and sell an HDMI solution or HDMI-enabled product.  This process includes at least

the following steps:  an Adopter must (1) wait until the Founders release the new version

of the HDMI Standard or intra-version changes of the HDMI Standard, review that

version or change, and design its products to comply; (2) wait until the Founders release

the new HDMI Compliance Test Specification, which is usually months after the release

of the HDMI Standard, review that version, and design the applicable test; (3) conduct

internal testing pursuant to the HDMI Test Specification; (4) provide HDMI Licensing

with a declaration certifying that the Adopter complied with the HDMI Test Specification;

and (5) submit a product to a Founder's ATC and wait for the Founder to test and approve

that product.

    41.    The Founders maintain their 6- to 12-month structural advantage by

releasing new versions of the HDMI Standard:

- HDMI Version 1.0 was released in December 2002;
- HDMI Version 1.1 was released in May 2004;
- HDMI Version 1.2 was released in August of 2005;
- HDMI Version 1.3 was released in June of 2006; and
- HDMI Version 1.4 is not yet released, but as stated by Silicon Image, the
  Founders expect to announce its release in 2008.

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

42.    The Founders also maintain their structural advantage by occasionally releasing intra-version changes to the HDMI Standard. For example, HDMI Licensing announced, in a press release on October 17, 2007, the release of new guidelines for how manufacturers must advertise their HDMI solutions and HDMI-enabled products and what functionality those solutions and products must have. HDMI Licensing dictated that "HDMI Adopters are required to implement" these new guidelines for all products initially shipped after October 17, 2008, and are "instructed to use 'commercially reasonable efforts' to comply with the guidelines as of October 17, 2007."

43.    Silicon Image's CEO boasted in a February 8, 2007 conference call with investors that he expects its structural, time advantage to continue:

> We didn't see any competition for [Version] 1.3 in '06. It was zero. And, so, all of the top-tier guys were working with us around their 1.3 plan. If you look at competitor announcements, they've talked about having stuff available that start sampling like in the first quarter of '07. That's too late for '07. So, I think that they will be focusing on trying to battle in '07 for '08. And I think that's where we will see them.

44.    Silicon Image stated it is "too late for '07" when referring to competitor announcements that they will have products to sample in the first quarter of '07 because customer buying decisions for HDMI solutions for each calendar year generally take place in the last few weeks of the preceding calendar year. As a result, customer buying decisions for 2007 had already been made by late 2006, thus the fact that competitors were able to announce "in the first quarter of '07" the availability of products for sampling meant they were "too late for '07." Silicon Image recognized this fact, which is why it stated in its investor call that competitors will focus "on trying to battle in '07 for '08." Accordingly, and as the release of the specifications for HDMI version 1.3 serves as an example, by timing the release of the new specifications to prevent competitors from developing products to sell prior to customers' buying decisions, Silicon Image's "structural advantage" extends well beyond 6 to 12 months.

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

45. Silicon Image's CEO has stated that in 2008, Silicon Image expects (1) the Founders to release a new version of the HMDI Standard and (2) Silicon Image to be ready with a new set of products to "take advantage" of that new standard:

> While the HDMI standard did not add any new releases in '07, we expect to advance the standard in 2008 with significant connectivity improvements that facilitate the movement of premium content within the home. These changes will bring the new set of product upgrade opportunities to Silicon Image, and we're fully prepared to take advantage of it.

46. Silicon Image CEO's public statements also boasted that it is Silicon Image's "strategy" to introduce revisions to the HDMI specifications once Silicon Image sees competitors in the marketplace:

> [F]or 2007, most of the pricing is set . . . . Now going into next year where most people will have — or many will have 1.3 capability, then you'll start to see more pressure on 1.3 and, of course, our strategy is to introduce new capabilities associated with the next revision.

47. One anticompetitive result of Silicon Image's structural, 6- to 12-month head start, is that for a 6- to 12-month period, Silicon Image is the only company with the latest HDMI solutions. Silicon Image thus restricts the supply of products and, based in part on this restricted supply, can and does charge prices that are significantly higher than prices for the same Silicon Image solutions once competing products become available in the market. Silicon Image's supra-competitive prices for its HDMI solutions are, in some instances, 300-400% greater than the prices Silicon Image charged once competitors were able to enter the market.

48. Independent analysts confirm that because few competitors make HDMI solutions, prices have been high. For example, In-Stat stated in 2006 that "[o]ver the past few years, with the relative lack of vendors for discrete HDMI transmitters and receivers, prices have remained relatively high." And in a report for 2007, In-Stat reported that "the high prices for HDMI silicon that were prevalent from 2003 through 2006 have been muted somewhat by more discrete chips suppliers and the integration trend." Silicon Image's CFO provided a similar explanation in an August 2, 2007 investor conference call

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1  that among the reasons for the decline in Silicon Image's average sales price is "increased
2  competition for our legacy products from companies seeking to enter or expand in the
3  HDMI market."

4       49.    Another anticompetitive result of Silicon Image's structural advantage is
5  that Silicon Image is able to set high prices of the newest versions of HDMI solutions.
6  Silicon Image's strategy of working with the Founders to modify the standard to enable
7  Silicon Image to be the first and only supplier of the newest versions of HDMI solutions
8  essentially creates a moving target for potential competitors. Because Silicon Image is the
9  first and, for a significant period of time, the only company selling the latest HDMI
10 solutions, it charges a premium and keeps those substantial profits to itself.

11      50.    On February 8, 2007, Silicon Image's CEO explained that this strategy
12 enables Silicon Image to extract a premium over the prices charged for the predecessor
13 solutions: "We probably get about a 25% to 30% premium over the pricing you'll see in
14 the market today for what — I know the gentleman was calling legacy HDMI, if there is
15 such a thing. But if you look at 1.1 and 1.2 silicon [assets] and you look at pricing.  1.3
16 chips are going to get about a 25% or 30% premium over that."

17      51.    As described by Silicon Image's CEO in a May 3, 2007 conference call with
18 investors, Silicon Image derives a substantial percentage of its revenue from new releases
19 of standards: "based on each new HDMI standard's release, we are targeting to achieve a
20 product mix that drives approximately 50% of our CE product revenue from products
21 based on these new standard releases."

22      52.    Accordingly, Silicon Image charges high prices — at least to its non-
23 Founder customers. Each of the Founders is also a customer of Silicon Image. Silicon
24 Image's CEO stated in a conference call with investors on August 2, 2007, "that the
25 founding group is composed of our customers." And on the Frequently Asked Questions
26 page of its website, Silicon Image responded to the question "Who are Silicon Image's
27 principal customers?"  by listing, among others, each of the Founders.  To illustrate,

28

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

below are several examples of the Founders' HDMI-enabled products that include Silicon

Image's HDMI solutions:

a.     Panasonic's Projection TV PT-53WXD63 incorporates Silicon

Image's PanelLink Cinema HDMI Technology, which contains the SiI9190 transmitter

and the SiI9993 receiver; Panasonic's Plasma TV TH-42PX20 incorporates Silicon

Image's PanelLink Cinema HDMI Technology; Panasonic's Plasma TV TH-50PX20

incorporates Silicon Image's PanelLink Cinema HDMI Technology; Panasonic's A/V

Receiver SAX-R&) incorporates Silicon Image's SiI9030 transmitter and SiI9031

receiver; and Panasonic's DVD Player DVD-S97 incorporates Silicon Image's SiI9030

transmitter and SiI9031 receiver.

b.     Another Founder's video entertainment device incorporates Silicon

Image's SiI9134 HDMI 1.3 transmitter, and several of that Founder's projectors

incorporate Silicon Image's PanelLink Cinema HDMI Technology.

c.     Hitachi uses the SiI1390 HDMI transmitter in its multimedia

notebooks.

d.     Another Founder used the SiI1930 HDMI transmitter in the first

Notebook PC with an HD DVD.

## SILICON IMAGE USES ITS MARKET CONTROL
## TO EXCLUDE COMPETITORS AND MAINTAIN HIGH PRICES

53.     As described above, an Adopter must submit its HDMI solution or HDMI-

enabled product to an ATC for testing.  Silicon Image operates four of the seven ATCs,

and, on information and belief, the only ATCs available to companies to test HDMI

solutions (as opposed to the testing of HDMI-enabled products) are operated by Silicon

Image.  The other Founders operate the other three ATCs.

54.     On May 18, 2007, Analogix submitted an HDMI solution to Silicon Image's

ATC in Sunnyvale for testing.  Although Silicon Image has publicly stated that it

generally completes testing within two weeks, on June 15, 2007 — 28 days after Analogix

submitted its product for testing — Silicon Image sent Analogix a notice asking for

- 17 -

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1    certain additional equipment to test the solution. Analogix submitted that equipment, but

2    Silicon Image has, even as of the date of this complaint, failed to respond to multiple

3    inquiries into the status of the testing. Silicon Image does not have a legitimate reason to

4    delay providing test results for Analogix's product and the decision to stall the testing of

5    Analogix's product was made to retaliate against Analogix for competing against Silicon

6    Image and to seek to exclude Analogix from the market.

7        55.    Since Analogix's May 18, 2007 submission, Analogix has learned that all

8    Silicon Image-operated ATCs were instructed by Silicon Image to no longer accept

9    Analogix's submissions. Because Silicon Image's ATCs are the only ATCs equipped to

10   test solutions, Silicon Image's refusal to complete testing on Analogix's solutions means

11   that Silicon Image has excluded, and continues to exclude, Analogix from the

12   marketplace. On information and belief, this is only one example in which Silicon Image

13   has excluded an HDMI solution or HDMI-enabled product and/or delayed the entrance

14   into the market of an HDMI solution or HDMI-enabled product through the improper use

15   of its ATC facilities. Silicon Image's efforts to exclude competitors have harmed

16   consumers by, among others, increasing prices, decreasing output, and reducing

17   competition in the markets for HDMI solutions and HDMI-enabled products.

18                   **THE ANTICOMPETITIVE ADOPTER AGREEMENT**

19       56.    Silicon Image and the other Founders have structured the licensing of the

20   HDMI Standard, through the Adopter Agreement and other means, to benefit themselves

21   and unreasonably restrain competition.

22       57.    As described above, Silicon Image, together with the other Founders and

23   through HDMI Licensing, created and revised the HDMI Standard, and in order to be

24   HDMI certified, Adopters must comply with all revisions. All non-Founders are excluded

25   from participating in the HDMI Standard setting process.

26       58.    The HDMI Standard, on information and belief, is and always has been

27   shrouded from public view:

28

- 18 -

a.    In order to view the draft HDMI Standard Version 0.9, persons were required to agree to a Specification Review Agreement that prevented disclosure.

b.    In order to view the current version, and on information and belief, all versions including and after HDMI Version 1.0, persons had to agree to the Specification Informational Agreement, which gives the viewer "a limited, non-exclusive, non-transferable, non-sublicensable license to use the Specification solely to evaluate and discuss the Specification to determine whether to obtain an additional license under the Specification. . . . No other rights or license, express or implied, are granted."

c.    Once an Adopter signs the Adopter Agreement, it must maintain the HDMI Standard "in confidence with at least the same degree of care that [the Adopter] uses to protect its own confidential and proprietary information, but no less than a reasonable degree of care under the circumstances."

59.    The Adopters Agreement grants each Adopter a nonexclusive license to the Founders' "Necessary Claims," which are defined as patent claims that are "necessarily infringed in order to implement and comply with the [HDMI Standard]." Neither the Founders nor HDMI Licensing discloses these "Necessary Claims" or even the patents that include these claims. Nor has HDMI Licensing or any Founder confirmed that there are any "Necessary Claims." Instead, the HDMI Standard states that the Founders "each *may* have patents and/or patent applications related to the [HDMI Standard]."

60.    The failure to disclose the patents being licensed has the following anticompetitive effects:

a.    A company deciding whether to become an Adopter cannot independently evaluate the "Necessary Claims" when deciding whether to take a license.

b.    Competitors do not know which patents are licensed, and thus cannot design around the HMDI Standard. This has the effect of decreasing competition below competitive levels for alternatives to HDMI-related technologies.

c.    Competitors do not know whether foreign patents are licensed or the geographical scope of the license to Necessary Claims. Because Adopters do not know

- 19 -

1  which patents are licensed or where those patents are filed, Adopters may be forced to pay

2  license fees relating to patents for countries in which they do not do business.

3        d.     Competitors do not know which patent owners they should contact if

4  they want to sign individual patent licenses as opposed to the package license. So while

5  the Adopter Agreement permits each Founder to license patents individually, this option is

6  illusory because competitors do not know which patents, if any, belong to which Founder.

7        e.     Interested parties do not know if the licensor Founders impermissibly

8  accept royalties after the expiration of patent terms. The Adopter Agreement states that

9  its term will last for an initial term of ten years and an automatic renewal, absent written

10  notification, of another five years. Because there is no indication of what patents are

11  licensed or how old those patents are, there is no way to know if the Adopter Agreement

12  excludes expired patents.

13        61.   The Adopter Agreement imposes the following royalty rates on Adopters:

14        &bull;  For each end-user product, $0.15 per unit sold;

15        &bull;  If the Adopter reasonably uses the HDMI logo on the product and

16           promotional materials, then $0.05 per unit sold (as opposed to $0.15 per

17           unit sold if the HDMI logo is not used); and

18        &bull;  If the Adopter implements High-bandwidth Digital Content Protection

19           set forth in the HDMI Specification, then $0.04 per unit sold.

20  This tiered royalty rate system is discriminatory because it charges a company three times

21  as much if that company does not use the HDMI logo. Because the use of the HDMI logo

22  inures to the benefit of HDMI Licensing and thus the Founders, the Adopter Agreement

23  discriminates against companies who choose not to advertise for HDMI Licensing and

24  thereby entrench the market control of Silicon Image and the other Founders.

25  Furthermore, the Founders gave HDMI Licensing the "sole discretion" to terminate or

26  modify its permission to an Adopter to use the HDMI logo.

27        62.   The Adopter Agreement permits Adopters to petition HDMI Licensing to

28  have one of their patents deemed a "Necessary Claim." But there is no procedure relating

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1   to this petitioning, nor is there an independent evaluator to determine what is a "Necessary

2   Claim." Instead, the Founders decide among themselves whether to accept the submitted

3   patent as a "Necessary Claim." On information and belief, no company other than the

4   Founders has ever owned any patent that qualifies as a "Necessary Claim."

5        63.    The Adopter Agreement does not contain a provision for the exclusion of an

6   invalid patent. The Adopter Agreement provides that if an Adopter challenges Necessary

7   Claims in a court, the PTO, or other official action, such claims are excluded from the

8   Necessary Claims licensed *only* to that Adopter. The Adopter Agreement does not

9   provide a procedure for the removal of Necessary Claims from the License to all Adopters

10  if those claims are adjudged invalid. As a result, the Adopter Agreement shields invalid

11  patents.

12  **SILICON IMAGE EXTENDS ITS CONTROL**

13  **OF THE MARKET FOR HDMI SOLUTIONS WITH SIMPLAY LABS, LLC.**

14       64.    Silicon Image formed Simplay Labs, LLC ("Simplay Labs") in January

15  2006, as a wholly owned subsidiary.

16       65.    Simplay Labs administers the Simplay HD Testing Program, which is a

17  program for compatibility testing of consumer-electronics products. Simplay Labs differs

18  from the ATCs, which Silicon Image also operates, because the ATCs test for compliance

19  with the HDMI Standard, while Simplay Labs tests for compliance with the Compatibility

20  Test Specification ("CTS"). The CTS is a broad, Silicon Image-created specification that

21  includes the HDMI Standard, High-bandwidth Digital Content Protection ("HDCP")

22  specifications, and numerous other technical features.

23       66.    Products that have passed the Simplay HD Testing Program can use the

24  Simplay HD logo on their products. The Simplay HD Testing Program has at least a four-

25  step process:

26       a.     A company must first become a member of the Simplay HD Testing

27  Program by signing the Simplay HD Testing Program Agreement. The Simplay HD

28  Testing Program Agreement provides, *inter alia*, that a company may only use the CTS

- 21 -                    COMPLAINT OF ANALOGIX
                              SEMICONDUCTOR, INC.

1    for purposes of obtaining test results, must keep the CTS confidential, and must give

2    Simplay Labs the ability to disclose all test results and related information to HDMI

3    Licensing and other organizations. The Simplay HD Testing Program Agreement lists

4    Silicon Image as a third-party beneficiary and gives Silicon Image the right to enforce all

5    provisions of the agreement. As part of this step, the company must pay Simplay Labs'

6    testing fees, which, for transmitter and receiver solutions, are $15,000 per compliance test.

7               b.    A company must next submit its product to Simplay Labs. As part of

8    this submission, the company must also submit, among other things, a completed Order

9    Form, Test Application, and Capabilities Declaration Form.

10              c.    Simplay Labs then tests the submitted product in accordance with the

11   CTS.

12              d.    Simplay Labs finally reports the test results to the submitting

13   company. Simplay Labs retains the ability to use the submitting company's logo and

14   participation in the Simplay HD Testing Program in Simplay Lab's advertising.

15        67.    Silicon Image operates ATCs in Sunnyvale, Shanghai, Schenzen, Germany

16   and the United Kingdom. Simplay Labs operates test centers at the same addresses as the

17   Silicon Image-operated ATCs, except for the United Kingdom where it does not operate

18   an ATC. A complete list of all Simplay Labs facilities is available at

19   http://www.simplayhd.com/about_us/locations.aspx.

20        68.    On information and belief, certain major national retailers, including Best

21   Buy Co., Inc. ("Best Buy"), do or will soon require testing and certification before they

22   will offer or sell any HDMI-enabled products. On information and belief, the Simplay

23   HD Testing Program is the only such testing and certification that Best Buy has permitted.

24   Based on these requirements from national retailers, and on information and belief,

25   companies are forced to submit their products and information to Simplay Labs in order to

26   compete in the market for HDMI solutions and HDMI-enabled products.

27        69.    As a result of Silicon Image's Simplay HD Testing Program, companies

28   must go through the four steps above and wait for Simplay Labs to report a passing test

- 22 -

1    before those companies can compete in the market for HDMI solutions and HDMI-

2    enabled products. On information and belief, these factors increase the cost of competing

3    against Silicon Image and have therefore reduced competition.

4         70.    Indeed, an article in the press addressed the exorbitant fees charged by

5    Silicon Image in connection with Simplay Labs' testing program and the lack of

6    transparency in its testing procedures. EE Times reported on July 27, 2007 in an article

7    entitled "*Consumer testing hijacked? Critics slam IC maker's costly, closed HDMI tests*":

8            [A] number of companies have begun to question [Simplay]
     lab's testing practices. The ***concerns cited include a lack of***
9            ***publicly available documented information on SimplayHD***
     ***testing procedures and pass/fail criteria; long waiting***
10           ***periods for getting a system tested; and "extortionate"***
     ***pricing*** for each test — $15,000, for each HDMI-equipped
11           digital entertainment "source" system, such as a high-
     definition TV or DVD player.

12

13        71.    Silicon Image has also used its control over Simplay Labs to retaliate

14   against Analogix. Analogix submitted its ANX9021 solution to Simplay Labs for testing.

15   Simplay Labs, however, refused to accept that submission. In an August 9, 2007 letter to

16   Analogix, Silicon Image cited the existing litigation between Silicon Image and Analogix

17   as the basis upon which Simplay Labs refuses to accept any Analogix product for Simplay

18   HD Testing. Analogix has learned that all Simplay Labs testing facilities were instructed

19   by Silicon Image to no longer accept Analogix's submissions.

20                       **RELEVANT PRODUCT MARKET**

21        72.    For purposes of Analogix's antitrust claims, there are two relevant markets:

22           a.    The Discrete HDMI Solution Product Market is the market for

23   discrete HDMI solutions that interface digital video and audio data transmissions from a

24   digital transmitter to a digital receiver.

25           b.    The HDMI Solution Product Market includes both the Discrete

26   HDMI Solution Product Market and integrated HDMI solutions — i.e., solutions that

27   incorporate HDMI-related functionality along with non-HDMI-related functionality.

28

- 23 -

1    73.    Silicon Image, HDMI Licensing, independent analysts, and Analogix all

2    state that the HDMI Standard is the de facto standard for transmitting digital data in

3    consumer-electronics products, and HDMI is an increasingly common standard for

4    transmitting digital data with other products, including personal computers.  Silicon Image

5    has held approximately 90% of the Discrete HDMI Solution Product Market and a

6    significant percentage of the HDMI Solution Product Market.

7    74.    The geographical scope of the product markets described above is

8    worldwide because technologies encompassed in the product markets are sold, purchased,

9    licensed, and used both inside and outside of the United States.

10    **FIRST CLAIM FOR RELIEF**

11    (Violation of Section 1 of the Sherman Act)

12    75.    Analogix realleges and incorporates each and every allegation set forth in

13    the paragraphs above.

14    76.    Silicon Image, HDMI Licensing, and Simply Labs have collaborated with

15    each other and with various co-conspirators, including the Founders, with the purpose and

16    effect of combining and conspiring to control the HDMI Standard and its testing in a

17    manner that restrains trade in violation of the antitrust laws of the United States, Section 1

18    of the Sherman Act, 15 U.S.C. § 1 *et seq.*

19    77.    As explained above, Silicon Image entered into an agreement, combination,

20    and/or conspiracy with various co-conspirators, including the Founders, which Silicon

21    Image effectuated in part through its wholly owned subsidiaries of HDMI Licensing and

22    Simplay Labs, intending to restrain competition by illegally and anticompetitively

23    creating and retaining control over the HDMI Standard and its testing, and by creating and

24    enforcing an anticompetitive Adopter Agreement.

25    78.    The agreement, combination, and/or conspiracy is an unreasonable restraint

26    of trade upon interstate commerce within the United States.  As a consequence of these

27    acts, competition and consumers have been damaged by increased prices, decreased

28

- 24 -

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1    output, and reduced competition in the markets for HDMI solutions and HDMI-enabled

2    products.

3        79.    Also as a consequence of these acts, Analogix, Silicon Image's competitors,

4    and would-be competitors have been damaged by the loss of past, present, and future

5    profits, the loss of customers and potential customers, and by the loss of goodwill.  In

6    addition, Analogix, Silicon Image's competitors and would-be competitors, competition,

7    and consumers will suffer irreparable harm if the agreement, combination, and/or

8    conspiracy is allowed to continue.

9    **SECOND CLAIM FOR RELIEF**

10   (Violation of Section 2 of the Sherman Act)

11       80.    Analogix realleges and incorporates each and every allegation set forth in

12   the paragraphs above.

13       81.    As explained above, Silicon Image has engaged and is engaging in

14   anticompetitive conduct with the specific intent of monopolizing the worldwide Discrete

15   HDMI Solution Product Market by, among other means:  controlling the HDMI Standard;

16   controlling the testing of HDMI solutions and HDMI-enabled products; and controlling

17   the licensing of HDMI Standard.  Silicon Image's anticompetitive conduct restrains trade

18   in violation of the antitrust laws of the United States, Section 2 of the Sherman Act, 15

19   U.S.C. § 2 *et seq.*

20       82.    Silicon Image's conduct has resulted in a monopoly in the worldwide

21   Discrete HDMI Solution Product Market and/or achieved a dangerous probability of

22   achieving monopoly power in the worldwide Discrete HDMI Solution Product Market.  If

23   Silicon Image's conduct is not enjoined, competitors will be further excluded from the

24   market, thereby increasing Silicon Image's monopoly power and monopoly control over

25   the relevant market.

26       83.    Silicon Image's monopoly power in the worldwide Discrete HDMI Solution

27   Product Market has not been achieved as a result of business growth or developed as a

28   consequence of superior technology, business acumen, or historic accident.  Instead,

- 25 -

1    Silicon Image has obtained and maintained its monopoly power through anticompetitive
2    conduct.

3        84.    Silicon Image's anticompetitive conduct is an unreasonable restraint of trade
4    upon interstate commerce within the United States.  As a consequence of these acts,
5    competition and consumers have been damaged by increased prices, decreased output, and
6    reduced competition in the markets for HDMI solutions and HDMI-enabled products.

7        85.    Also as a consequence of these acts, Analogix, Silicon Image's competitors
8    and would-be competitors have been damaged by the loss of past, present, and future
9    profits, the loss of customers and potential customers, and by the loss of goodwill.  In
10   addition, Analogix, Silicon Image's competitors and would-be competitors, competition,
11   and consumers will suffer irreparable harm if Silicon Image's monopolization and/or
12   attempted monopolization are allowed to continue.

13                        **THIRD CLAIM FOR RELIEF**

14                   (Violation of the California Cartwright Act)

15       86.    Analogix realleges and incorporates each and every allegation set forth in
16   the paragraphs above.

17       87.    Silicon Image, HDMI Licensing, and Simplay Labs have conspired with
18   each other and with various other co-conspirators, including the Founders, with the
19   purpose and effect of combining and conspiring in restraint of the trade and commerce
20   described above in violation of Section 16720 of the California Business and Professions
21   Code.

22       88.    As explained above, Silicon Image entered into an agreement, combination,
23   and/or conspiracy with various co-conspirators, including the Founders, which Silicon
24   Image effectuated in part through its wholly owned subsidiaries of HDMI Licensing and
25   Simplay Labs, intending to restrain competition by illegally and anticompetitively
26   creating and retaining control over the HDMI Standard and its testing, and by creating and
27   enforcing an anticompetitive Adopter Agreement.

28

COMPLAINT OF ANALOGIX
                                     SEMICONDUCTOR, INC.

1    89.    The above-described agreements, combinations, and/or conspiracies result

2    in an unreasonable restraint on trade and commerce, a decrease in the production and an

3    increase in the price of merchandise, and restrict competition.

4    90.    As a consequence of these acts, Analogix, Silicon Image's competitors and

5    would-be competitors have been damaged by the loss of past, present, and future profits,

6    the loss of customers and potential customers, and by the loss of goodwill.  Also as a

7    consequence of these acts, competition and consumers have been damaged by increased

8    prices, decreased output, and reduced competition in the markets for HDMI solutions and

9    HDMI-enabled products.  In addition, Analogix, Silicon Image's competitors and would-

10   be competitors, competition, and consumers will suffer irreparable harm if the agreement,

11   combination, and/or conspiracy is allowed to continue.

12                          **FOURTH CLAIM FOR RELIEF**

13         (Violation of California Business and Professions Code Section 17200)

14   91.    Analogix realleges and incorporates each and every allegation set forth in

15   the paragraphs above.

16   92.    By the acts alleged in the preceding paragraphs, Defendants have committed

17   business acts and practices that are unlawful, fraudulent, and unfair, in violation of

18   California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-09.

19   93.    Defendants' business acts and practices are unlawful, fraudulent, and unfair,

20   and violate the UCL because Silicon Image and HDMI Licensing have restrained trade

21   and competition in violation of the antitrust laws of the United States, Sections 1 and 2 of

22   the Sherman Act, 15 U.S.C. § 1 *et seq.*, the California Cartwright Act, and of California,

23   Cal. Bus. & Prof. Code § 16720.

24   94.    Defendants' business acts and practices are unlawful, fraudulent, and unfair,

25   and violate the UCL because Silicon Image's and HDMI Licensing's conduct threatens an

26   incipient violation of antitrust laws, violates the policy and spirit of those laws, and

27   significantly threatens and harms competition.

28

                                    - 27 -                COMPLAINT OF ANALOGIX
                                                          SEMICONDUCTOR, INC.

1       95.    As a consequence of these acts, Analogix, Silicon Image's competitors and

2  would-be competitors have been harmed and Silicon Image has been unjustly enriched.

3  Also as a consequence of these acts, competition and consumers have been damaged by

4  increased prices, decreased output, and reduced competition in the markets for HDMI

5  solutions and HDMI-enabled products.  In addition, Analogix, Silicon Image's

6  competitors and would-be competitors, competition, and consumers will suffer irreparable

7  harm if the agreement, combination, and/or conspiracy is allowed to continue.

8                            **PRAYER**

9       WHEREFORE, Analogix prays for judgment against Defendants as follows:

10      1.    That the Court adjudge and decree that Defendants have restrained trade in

11  the relevant markets by entering into unlawful combinations and contracts in violation of

12  Section 1 of the Sherman Act, 15 U.S.C. § 1;

13      2.    That the Court adjudge and decree that Defendants have monopolized or

14  attempted to monopolize the relevant markets in violation of Section 2 of the Sherman

15  Act, 15 U.S.C. § 2;

16      3.    That the Court adjudge and decree that Defendants have restrained trade in

17  the relevant markets by entering into unlawful combinations and contracts in violation of

18  the California Cartwright Act, Section 16720 of the California Business and Professions

19  Code;

20      4.    That the Court adjudge and decree that Defendants' conduct is unlawful,

21  unfair, and fraudulent in violation of Section 17200 of the California Business and

22  Professions Code;

23      5.    That the Court enter an injunction restraining the Defendants, preliminarily

24  and permanently, from continuing their anticompetitive conduct as alleged herein;

25      6.    That the Court decree such other affirmative relief and enter other such

26  orders as may be necessary to remedy the effects of the violations of law alleged in this

27  complaint and to insure that competitive conditions are restored to the relevant markets;

28      7.    That Analogix be awarded damages, including treble damages, in an amount

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1  to be determined at trial;

2       8.    That Analogix be awarded restitution in an amount to be determined at trial;

3       9.    That Analogix be awarded, and Defendants required to pay, its reasonable

4  attorneys' fees and costs of suit;

5       10.   That Analogix be awarded interest at the maximum rate allowed by law; and

6       11.   That the Court grant any other legal and/or equitable relief as it deems just

7  and proper.

8

9  Dated:  June 11, 2008

10      DARIN W. SNYDER (S.B. #136003) dsnyder@omm.com
        THOMAS P. BROWN (S.B. #182916) tbrown@omm.com
        RYAN J. PADDEN (S.B. #204515) rpadden@omm.com
11      STEVEN E. CONIGLIARO (S.B. #232102) sconigliaro@omm.com
        O'MELVENY & MYERS LLP
12      Embarcadero Center West
        275 Battery Street, 26th Floor
13      San Francisco, CA 94111-3305
        Telephone:   (415) 984-8700
14      Facsimile:   (415) 984-8701

15

16      By: _____

17          Thomas P. Brown
            Attorneys for Plaintiff
18          Analogix Semiconductor, Inc.

19

20

21

22

23

24

25

26

27

28

COMPLAINT OF ANALOGIX
SEMICONDUCTOR, INC.

1

## DEMAND FOR JURY TRIAL

2          Plaintiff Analogix Semiconductor, Inc. hereby demands a jury trial on each claim

3    for relief.

4

5    Dated:  June 11, 2008          DARIN W. SNYDER (S.B. #136003) dsnyder@omm.com
                                    THOMAS P. BROWN (S.B. #182916) tbrown@omm.com
6                                   RYAN J. PADDEN (S.B. #204515) rpadden@omm.com
                                    STEVEN E. CONIGLIARO (S.B. #232102) sconigliaro@omm.com
7                                   O'MELVENY & MYERS LLP
                                    Embarcadero Center West
8                                   275 Battery Street, 26th Floor
                                    San Francisco, CA 94111-3305
9                                   Telephone:    (415) 984-8700
                                    Facsimile:    (415) 984-8701
10

11                                  By: _____

12                                        Thomas P. Brown
                                    Attorneys for Plaintiff
13                                  Analogix Semiconductor, Inc.

SFI:715885.5
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 30 -                COMPLAINT OF ANALOGIX
                                                      SEMICONDUCTOR, INC.

JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

Analogix Semiconductor, Inc.

### DEFENDANTS

Silicon Image, Inc., HDMI Licensing, LLC and Simplay Labs, LLC

(b) County of Residence of First Listed Plaintiff   Santa Clara County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant     Santa Clara County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

O'Melveny & Myers LLP
275 Battery Street, Suite 2600
San Francisco, CA 94111

Attorneys (If Known)

ADR

E-FILING

C08 02917 PVT

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| | | | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | or Defendant) | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. § 1 et seq. (The Sherman Act)

Brief description of cause:
Unlawful conspiracy and unreasonable restraint on trade in violation of U.S. and California antitrust statutes

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE."  Silicon Image, Inc. v. Analogix Semiconductor, Inc.  3:07-cv-00635-JCS

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☐ SAN FRANCISCO/OAKLAND       ☒ SAN JOSE

DATE
6/11/2008

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**        Example:        U.S. Civil Statute: 47 USC 553
                                                                Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.
**Date and Attorney Signature.** Date and sign the civil cover sheet.