1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 10/28/08**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ANALOGIX SEMICONDUCTOR, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>SILICON IMAGE, INC., a Delaware corporation; HDMI LICENSING, LLC, a Delaware Corporation; and SIMPLAY LABS, LLC, a Delaware Corporation;<br><br>Defendants. | Case Number C 08-2917 JF (PVT)<br><br>ORDER[1] GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND<br><br>[re: doc. no. 18] |

Plaintiff Analogix Semiconductor, Inc. ("Analogix") filed the instant case against Defendants Silicon Image, Inc. ("Silicon Image"), HDMI Licensing, LLC ("HDMI"), and Simplay Labs, LLC ("Simplay"), alleging violations of Sections 1 and 2 of the Sherman Act, § 16720 of the California Cartwright Act, and § 17200 of the California Business & Professions Code. Defendants move to dismiss the complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, Defendants' motion will be granted, with leave to amend.

---

[1] This disposition is not designated for publication and may not be cited.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**I.  BACKGROUND**

The instant dispute involves High-Definition Multimedia Interface ("HDMI") solutions. HDMI solutions are chip-based interfaces that are utilized in the transmission of digital data.  A product that incorporates an HDMI solution typically is referred to as being "HDMI-enabled." For example, an HDMI-enabled digital transmitter, such as a DVD player or cable box that has a built-in HDMI transmitter solution, can communicate with an HDMI-enabled digital receiver, such as a television that has a built-in HDMI receiver solution.

Defendant Silicon Image designs and manufactures HDMI transmitter and receiver solutions.  The complaint alleges that in 2001, Silicon Image met with several companies, including Hitachi, Ltd., Matsushita Electric Industrial Co., Ltd., Philips Consumer Electronics International B.V., Thomson Multimedia, and Toshiba Corporation, to establish a "working group" for the purposes of creating an HDMI standard ("HDMI Standard").  The purpose of the HDMI Standard is to foster a common specification for HDMI solutions.  HDMI enjoys some level of government support in certain product areas.  For example, since 2003 the Federal Communications Commission ("FCC") has required that all high-definition cable boxes include an HDMI solution or a Digital Visual Interface ("DVI") solution.  According to Analogix, DVI is an alternative and less popular digital solution standard.  In contrast, the HDMI Standard has become the *de facto* industry protocol for many digital markets.

The members of the HDMI working group are referred to as the "Founders."  The Founders allegedly are parties to the "Founder's Agreement," a document that is not publicly available but has been referred to in Silicon Image's financial statements.  Analogix alleges that the Founder's Agreement provides the framework for the Founders' control over the HDMI Standard.  The Founder's Agreement also may include terms regarding revenue sharing among the Founders.

In November 2002, the Founders announced the creation of Defendant HDMI Licensing. HDMI Licensing is a wholly-owned subsidiary of Silicon Image and serves as the agent for the licensing of the HDMI Standard to companies that make, use, or sell HDMI solutions or HDMI-

2

1   enabled products.  HDMI Standard licensees include the Founders as well as "Adopters."

2   Adopters are required to sign the "Adopter Agreement" before they can utilize the HDMI

3   Standard.  Thus, if a company does not sign the Adopter Agreement, it effectively is excluded

4   from making, using or selling either HDMI solutions or HDMI-enabled products.  Signatories to

5   the Adopter Agreement must update their products to comply with all revisions made to the

6   HDMI Standard.  The Adopter Agreement grants a nonexclusive license to "necessary" patent

7   claims that cover the HDMI standard, but the Adopter Agreement does not disclose the actual

8   patents.  In return for the nonexclusive license, Adopters pay royalties to HDMI Licensing.

9   Initially, Silicon Image received 100% of the royalty revenues, but since 2007 a revenue-sharing

10  agreement among the Founders has been in place.

11          Certain Founders and Adopters, including Silicon Image and Analogix, manufacture

12  HDMI solutions and sell these solutions to companies that manufacture HDMI-enabled products.

13  There also are certain companies that make both HDMI solutions and HDMI-enabled products.

14  Finally, manufacturers of HDMI solutions also may purchase HDMI solutions from other HDMI

15  manufacturers.  For example, the complaint alleges that many, if not all, of the Founders have

16  purchased HDMI solutions from Silicon Image in the past.

17          Analogix alleges that there are two distinct product markets for HDMI solutions.  The

18  first is "discrete" HDMI solutions, which is comprised of HDMI solutions that have only HDMI

19  functionality.  The second is the "HDMI Solution Product Market," which Analogix defines as

20  including both discrete solutions and "integrated" HDMI solutions.  Integrated HDMI solutions

21  are solutions that include both HDMI functionality and non-HDMI functionality, such as digital

22  video recording functionality.  Analogix describes the integrated HDMI market as being

23  "broader" than the discrete HDMI market.  In addition, integrated HDMI solutions generally are

24  priced higher than discrete HDMI solutions because of the more diverse functionality of an

25  integrated solution.  The alleged geographic market for both discrete HDMI solutions and the

26  HDMI Solution Product Market is worldwide.

27          Analogix alleges that Silicon Image possesses more than ninety percent of the market for

28  discrete HDMI solutions; the remaining market share is split among several companies, including

3

Analogix.  Analogix alleges further that while there is some competitive substitution between integrated and discrete HDMI solutions, the discrete HDMI market in fact is a distinct and unique market.  In support of this allegation, the complaint refers to several statements by Silicon Image's CEO, who has stated that discrete solutions often are first on the market before integrated solutions, and that certain customers are interested in purchasing only discrete HDMI solutions.  Regardless of customer preference, when a new HDMI Standard is implemented, the new technology initially is available only in discrete HDMI solutions.

According to Analogix, Silicon Image and the Founders purposefully have structured the HDMI market to their advantage.  It is alleged that through the Founder's Agreement, Silicon Image and the other Founders have restrained competition by delaying disclosure of revisions to the HDMI Standard.  Allegedly, Adopters are not allowed to have any input regarding revisions to the HDMI Standard.  Analogix alleges that because of this lack of transparency, Silicon Image and other Founders have a six to twelve month advantage in bringing products to market.[2]  In support of this allegation, the complaint includes multiple examples of instances in which Founders were the first to market various HDMI solutions and HDMI-enabled products.

The Adopters Agreement requires that before selling the latest HDMI solutions or HDMI-enabled products, Adopters must test their solutions and/or products at an authorized testing center ("ATC").  Silicon Image owns four of the seven ATC's worldwide, and it operates the only ATC located in North America.  Silicon Image's ATC's also are the only facilities that are configured to test HDMI solutions, as opposed to HDMI-enabled products.  Analogix contends that the testing requirement further delays market entry by non-Founder competitors.

Analogix also alleges that Silicon Image's control over the HDMI solutions market has been expanded by Simplay, which like HDMI Licensing is a wholly-own subsidiary of Silicon Image.  Simplay administers the Simplay HD Testing Program, which tests HDMI solutions and

_____

[2] Silicon Image's CEO allegedly has stated that the Founders have a "structural advantage…because we are helping the founding members figure out where to go with the development of the standard.  It gives us about, roughly, a six- to 12-month lead in the market." Complaint ¶36.

4

1    HDMI-enabled products for compliance with a broad-based consumer electronics standard.  This

2    consumer electronics standard incorporates the HDMI Standard as well as other technical

3    specifications.  Analogix contends that the fees for the testing procedure are "exorbitant."  More

4    important, however, is the fact that certain retailers now require testing and certification under

5    the Simplay program before allowing the sale of HDMI-enabled products.  As a result, Simplay

6    can theoretically delay or even prevent the sale of HDMI-enabled products to retail consumers.

7        Analogix claims that competition has been reduced within the discrete HDMI solutions

8    market because of the barriers erected by Silicon Image and other Founders.  Specifically,

9    Analogix asserts that Silicon Image and the other Founders have conspired to reduce output and

10   raise prices.  Moreover, through forced adherence to the restrictions imposed by the Adopter

11   Agreement, manufacturing costs allegedly are increased to the detriment of consumers.

12       The complaint also alleges that Silicon Image has acted unilaterally to exclude Analogix

13   from the HDMI solutions market.  Analogix claims that Silicon Image has prevented testing of

14   Analogix's HDMI solutions by recently instructing ATC's to refuse Analogix's testing

15   submissions.  Because Silicon Image operates the only ATC's for HDMI solutions, Analogix

16   now is excluded from the HDMI solutions market.  Similarly, Analogix alleges that Simplay no

17   longer will test Analogix's HDMI solutions because of the legal disputes now pending between

18   the parties.

19                            **II.  STANDARD OF REVIEW**

20       For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the

21   Court must construe the complaint in the light most favorable to the plaintiff.  *Jenkins v.*

22   *McKeithen*, 395 U.S. 411, 421 (1969).  "Dismissal under Rule 12(b)(6) is appropriate only where

23   the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal

24   theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  "While

25   a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

26   allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

27   requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

28   of action will not do."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (citations

5

1    omitted).

2                                   **III.  DISCUSSION**

3         A.  Sherman Act § 1

4         Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or

5    conspiracy, in restraint of trade."  15 U.S.C. § 1.  Thus, a successful claim under Section 1

6    requires (1) an agreement that (2) unreasonably restrains trade and (3) has an effect on interstate

7    or foreign commerce.  *See*, *e.g.*, *Tanaka v. Univ. of S. Cal*., 252 F.3d 1059, 1062 (9th Cir. 2001).

8    At the pleading stage the plaintiff only need allege facts that, if true, would establish the three

9    elements of a Section 1 claim.  *See Twombly*, 127 S. Ct. at 1964-66.

10                  1.  Alleged Conspiracy between Silicon Image, HDMI Licensing, and Simplay

11        Silicon Image contends that a conspiracy among Silicon Image, HDMI Licensing, and

12   Simplay cannot exist as a matter of law because it is well-settled that a company cannot

13   unlawfully conspire with its wholly-owned subsidiaries.  *See Copperweld Corp. v. Independence*

14   *Tube Corp*., 467 U.S. 752, 777 (1984) ("[parent company] and its wholly owned subsidiary…are

15   incapable of conspiring with each other for purposes of § 1 of the Sherman Act.").  The Court

16   agrees that to the extent that the complaint alleges that Silicon Image and its wholly-owned

17   subsidiaries were co-conspirators, such an allegation does not state a cognizable claim.

18   However, Analogix also alleges that there were additional conspirators, namely the other

19   Founders.  If HDMI Licensing and Simplay are involved in horizontal arrangements among

20   Silicon Image and other Founders, the Court may consider Silicon Image and its subsidiaries to

21   be a single entity and still subject them to Section 1 liability.  *See Copperweld*, 467 U.S. at 771 (a

22   "parent and its wholly owned subsidiary have a complete unity of interest.").

23                       2.  Founder's Agreement and the HDMI Standard

24        Silicon Image and the other Founders are members of what is commonly referred to as a

25   standards-setting organization ("SSO").  SSO's are not illegal *per se* and often create a net pro-

26   competitive effect.  *See*, *e.g.*, *Rambus, Inc. v. Infineon Techs. AG*, 330 F. Supp. 2d 679, 696 (E.D.

27   Va. 2004) ("Product uniformity through standardization, especially in technological markets,

28   facilitates the comparison of competing products, which benefits consumers in the short run and

                                          6

1  provides incentives for engineers to develop the next generation of compatible products, thereby

2  providing longer-term consumer benefits.").  Accordingly, any alleged agreement among the

3  members of a SSO is analyzed under a rule of reason.  *Allied Tube & Conduit Corp. v. Indian*

4  *Head, Inc*., 486 U.S. 492, 501 (1988).  SSO's may be abused in furtherance of anticompetitive

5  goals.  In *Allied Tube*, the Supreme Court noted that SSO's "often have economic incentives to

6  restrain competition and that the product standards set by such associations have a serious

7  potential for anticompetitive harm."  *Id*. at 500.  Absent safeguards such as free flow of

8  information regarding technical designs and fair licensing terms, a SSO may be used as a tool to

9  restrict competition.  *See id.* at 501.  A single dominant entity may influence a SSO to "magnify

10  its power and effectuate anticompetitive effects on the market in question."  *Rambus*, 330 F.

11  Supp. 2d at 696-97.

12        Here, the alleged horizontal agreement involves various alleged arrangements between

13  Silicon Image and other Founders to restrict competition within the HDMI solutions market.  The

14  overall arrangement allegedly includes both the non-public Founder's Agreement and the

15  Adopter Agreement.  Defendants do not dispute that there is an agreement among the Founders,

16  but rather that such an agreement violates antitrust law.  For purposes of the instant motion, the

17  Court concludes that Analogix sufficiently has pled facts that demonstrate the existence of an

18  agreement among the Founders and Silicon Image regarding the HDMI solutions market.  *See*

19  *Twombly*, 127 S. Ct. at 1965 ("a [Section 1] claim requires a complaint with enough factual

20  matter (taken as true) to suggest that an agreement was made.")

21                        3.  Relevant Market

22        Silicon Image contends that Analogix has failed to plead adequately that the alleged

23  agreement among the Founders has caused harm to a defined market.  "Failure to identify a

24  relevant market is a proper ground for dismissing a Sherman Act claim."  *Tanaka*, 252 F.3d at

25  1063.  There is no requirement that a relevant market for purposes of a Section 1 claim be pled

26  with specificity.  *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir.

27  2008).  Thus, Analogix's complaint is not deficient for purposes of a Rule 12(b)(6) motion so

28  long as the description of the alleged market is inadequate as a matter of law.  *See id.*  However,

7

1    there are several threshold requirements for legal sufficiency.  For example, the relevant market

2    must be defined by the products or producers, not its consumers.  *Id*.  In addition, the relevant

3    market must "encompass the product at issue as well as all economic substitutes for the product."

4    *Id*.  In other words, the relevant market should be defined by the reasonable interchangeability

5    between the product and its substitutes.  *See id.*

6           The complaint at issue defines two relevant markets:

7           a.  The Discrete HDMI Solution Product Market is the market for discrete
            HDMI solutions that interface digital video and audio data transmissions
8           from a digital transmitter to a digital receiver.

9           b.  The HDMI Solution Product Market includes both the Discrete HDMI
            Solution Product Market and integrated HDMI solutions – i.e., solutions
10          that incorporate HDMI-related functionality along with non-HDMI-related
            functionality.

11   Complaint ¶72.  The Court agrees with Defendants that this description is legally inadequate.

12   Analogix has not described how interchangeable the markets for discrete and integrated solutions

13   are.  The complaint sets forth in relatively vague terms that a customer may prefer to purchase a

14   discrete solution over an integrated solution for a variety of reasons, including cost, technological

15   improvements, and the nature of the non-HDMI functionality in the integrated solution.  Nor is it

16   clear the extent to which other standards, such as DVI, present viable substitutes to either discrete

17   or integrated HDMI solutions.  While the complaint states that the HDMI Solution Product

18   Market "includes" integrated and discrete solutions, it does not explain whether the HDMI

19   Solution Product Market is composed solely of discrete and integrated HDMI solutions, or

20   whether there are other solutions within this market.  Finally, Silicon Image correctly points out

21   that the FCC requirement regarding HDMI implementation applies only to cable-ready television

22   sets.  The complaint does not describe how the HDMI solution market should be defined in terms

23   of other HDMI-enabled product markets.  It is unclear whether specific HDMI solutions are

24   designed for specific HDMI-enabled products, or if a particular HDMI solution can be

25   incorporated into multiple HDMI-enabled products.  In other words, while Silicon Image may

26   control ninety percent of the discrete HDMI solution market, it is not clear whether it has the

27   same market share in HDMI-enabled products that incorporate those discrete solutions.

28

8

1  Ultimately, Analogix's complaint does not adhere to the requirement that a plaintiff must

2  "define its proposed relevant market with reference to the rule of reasonable interchangeability

3  and cross-elasticity of demand." *In re eBay Seller Antitrust Litig.*, 545 F.Supp.2d 1027, 1031

4  (N.D. Cal. 2008) (quoting *Queen City Pizza, Inc. v. Domino's Pizza Inc.*, 124 F.3d 430, 436 (3d

5  Cir.1997).  The rule of reasonable interchangeability requires some explanation regarding

6  possible substitutes.  *See Queen City*, 124 F.3d at 436-37.  DVI-enabled solutions apparently

7  exist and are a substitute for certain digital consumer products.  In an amended complaint

8  Analogix should set forth additional information regarding the substitutability of DVI or other

9  digital technology solutions as applied to the relevant markets.

10  Likewise, if there minimal cross-elasticity of demand because HDMI-enabled solutions

11  are the only relevant market, the Founders should be able to increase prices with relative

12  impunity.  However, instead of referring to ways in which previous price changes influence

13  substitution, Analogix's definitions of the relevant markets seem to depend mostly on where

14  Silicon Image enjoys some level of success.  An amended complaint should include facts that

15  support Analogix's allegation as to why the discrete HDMI solution and HDMI Solution Product

16  Market are the relevant markets for purposes of its antitrust claims, to the exclusion other digital

17  solution formats.

18  4.  Market Power

19  Pleadings for a rule of reason claim must allege that the defendant has market power in a

20  particular market.  *Newcal*, 513 F.3d at 1044 ("In order to state a valid claim under the Sherman

21  Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'  That

22  is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power

23  within that market.").  As noted above, Analogix alleges that Silicon Image has a ninety percent

24  market share in the discrete solution market and a "significant percentage" of the total HDMI

25  solution product market.  Analogix also contends that Silicon Image has acknowledged that it is

26  able to boost prices by controlling the HDMI Standard.  However, the sufficiency of these

27  allegations is unclear because of the vagueness of the market to which they apply.  Should

28  Analogix allege facts that define a legally cognizable market and show "evidence of restricted

9

output and supracompetitive prices," such allegations will be sufficient to survive a motion to

dismiss.  *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

### B.  Section 2 of the Sherman Act

"A claim of monopolization under § 2 of the Sherman Act has two elements: (1) the

possession of monopoly power in the relevant market; and (2) the willful acquisition or

maintenance of that power as distinguished from growth or development as a consequence of a

superior product, business acumen, or historic accident."  *In re eBay*, 545 F. Supp. 2d at 1031

(citing *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570 (1966)).  Silicon Image contends that

Analogix's Section 2 claim (like its Section 1 claim) fails to plead adequately the relevant

market.  In addition, Silicon Image asserts that Analogix has failed to plead adequately facts

supporting an allegation of monopoly power within the relevant market, and as a result there is

no evidence of harm to the relevant market.  *See Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1413-

14 (9th Cir. 1991).

As is apparent from the foregoing discussion, the Court agrees that Analogix has failed to

plead adequately the relevant market.  A proper definition of the relevant market is required for a

successful claim under either Section 1 or Section 2 of the Sherman Act.  *Newcal*, 513 F.3d at

1044 n.3 ("The 'relevant market' and 'market power' requirements apply identically under the

two different sections of the [Sherman] Act."). [3]

### C.  Cartwright Act and Unfair Competition

"California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, is patterned after

the Sherman Act.  California courts look to federal case law interpreting the Sherman Act for

guidance in interpreting the Cartwright Act."  *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182

F.3d 1096, 1101 n.2 (9th Cir. 1999).  Because Analogix has failed to plead adequately the

relevant product market for purposes of a claim under either Section 1 or 2 of the Sherman Act,

Analogix's claim under the California Cartwright Act also will be dismissed with leave to

---

[3] The parties also disagree as to whether Analogix pled both attempted monopolization
and monopolization.  Because Analogix will be granted leave to file an amended complaint, the
Court expresses no opinion as to this issue.

10

1    amend.

2          Analogix's unfair competition claim also will be dismissed.  The complaint premises the

3    unfair competition claim on conduct that was allegedly unlawful under the antitrust laws.  *See*

4    *Chavez v. Whirlpool Corp*., 113 Cal. Rptr. 2d 175, 184 (Ct. App. 2001).[4]

5                                    **IV.  ORDER**

6          Good cause therefor appearing, IT IS HEREBY ORDERED that Defendants' motion to

7    dismiss Analogix's complaint as to claims 1 through 4 is GRANTED, with leave to amend.  Any

8    amended complaint must be filed within thirty (30) days of the date of this Order.

9

10

11

12   DATED: October 28, 2008

13

14                                    _____
                                      JEREMY FOGEL
15                                    United States District Judge

16

17

18

19

20

21

22

23

24

25

26   _____

27        [4] Analogix also argues that it has asserted a claim for fraud under California unfair
     competition law.  However, the complaint does not allege expressly the elements of fraud.
28   Analogix may attempt to plead a fraud claim in its amended complaint.

                                    11

1   This Order has been served upon the following persons:

2   Bijal Vijay Vakil     bvakil@whitecase.com, vfarias@whitecase.com

3   Daniel E. Alberti     dalberti@mwe.com, clovdahl@mwe.com

4   Darin Walter Snyder     dsnyder@omm.com, cholsome@omm.com, mo'donnell@omm.com

5   David Todd Alexander     dtalexander@mwe.com, clovdahl@mwe.com

6   Julie Dawn Wood     jwood@omm.com, ihaas@omm.com

7   Michael Robert O'Neill     moneill@mwe.com

8   Raymond A. Jacobsen , Jr     rjacobsen@mwe.com

9   Ryan James Padden     rpadden@omm.com, kquintanilla@omm.com

10   Steven Ellis Conigliaro     sconigliaro@omm.com

11   Terrence Patrick McMahon     tmcmahon@mwe.com, mkenner@mwe.com

12   Thomas Patrick Brown     tbrown@omm.com, dbordessa@omm.com

13   William Diaz     wdiaz@mwe.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 08-2917 JF (PVT)
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND
(JFLC1)